**Gary and Patricia OTT, Plaintiffs,**

v.

**William CREWS, d/b/a Crews Trucking, et al., Defendants.**

**STRO–WOLD INTERNATIONAL LIVE-STOCK SERVICES, LTD., Defendant, Third-party Plaintiff-Appellee, Cross-Appellant,**

v.

**SHELTER MUTUAL INSURANCE COMPANY, Third-Party Defendant-Appellant, Cross-Appellee.**

Nos. 86–2901, 86–2985.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1987.

Decided Oct. 1, 1987.

Dudley D. Birder, Jr., Liebmann, Conway, Olejniczak & Jerry, S.C., Green Bay, Wis., for appellant.

James P. Burnett, Bonk, Lutz, Burnett & McDermott, Chilton, Wis., for appellee.

Before WOOD, EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

This appeal arises from a dispute between an insurer, Shelter Mutual Insurance Company, and its insured, Stro-Wold International Livestock Services, Ltd., over the coverage of a general liability policy. The district court granted summary judgment for the insurer on the ground that exclusions contained in the policy precluded coverage for damages sustained by a third party. Additionally, the district court held that, despite its ultimate conclusion regarding coverage, the insurer had a duty to defend its insured on the claim asserted against it from the date the insured first requested a defense until the date the insurer filed its motion for summary judgment. We affirm.

## I.

There is no dispute as to the facts. Gary and Patricia Ott, Wisconsin farmers, purchased 86 hogs from Stro-Wold International Livestock Services, Ltd. ("Stro-Wold") in April 1980. Approximately 3 months later, the hogs were diagnosed as having swine dysentery and the Otts' farm was quarantined. The Otts filed suit in state court on May 14, 1982, naming Stro-Wold as a defendant. The complaint alleged a variety of causes of action including breach of

[*] The Honorable Hubert L. Will of the Northern District of Illinois, sitting by designation.

express and implied warranties in the inspection and sale of the hogs, negligence, breach of contract, and strict liability for damages the Otts incurred to their property as a result of the diseased pigs that Stro-Wold sold infecting other livestock.

At all times relevant to this matter, Stro-Wold was insured by Shelter Mutual Insurance Company. The policy issued to Stro-Wold under the heading "COMPREHENSIVE GENERAL LIABILITY INSURANCE" provided in relevant part:

### 1. COVERAGE A—BODILY INJURY LIABILITY

#### COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. **bodily injury** or

B. **property damage**

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if the allegations of the suit are groundless, false or fraudulent. . . .

The policy also included the following provisions under the heading "**Exclusions**":

This insurance does not apply:

(n) to bodily injury or property damage to the named insured's products arising out of such products;

(p) to bodily injury or property damage included within the completed operations hazard or the products hazard.

The policy contained the following definition of "products hazard":

"[P]roducts hazard" includes bodily injury or property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from the premises owned by or rented to the named insured and the actual physical possession of

such products has been relinquished to others.

Finally, the policy defined "named insured's products" as:

goods or products manufactured, sold, or handled or distributed by the named insured or by others trading under his name. . . .

In February 1984, Stro-Wold asked Shelter to provide a defense in the Otts' suit; Shelter refused. Subsequently, the Otts filed an amended complaint also naming Shelter as a defendant. On January 10, 1985, Shelter successfully petitioned for removal of this action of federal court. Stro-Wold then filed a cross-claim against Shelter, alleging that Shelter's policy covered any liability that might be assigned to Stro-Wold as a result of the Otts' suit. Shelter did not respond to Stro-Wold's claim until August 8, 1985, when Shelter filed a motion for summary judgment alleging that the exclusions contained in the policy precluded coverage.

The district court agreed and granted Shelter's motion for summary judgment. However, in reaching the no-coverage decision, the court nevertheless found that the Otts' claims were potentially within the policy's coverage and that Shelter therefore had a duty to defend Stro-Wold from February 27, 1984 (the date when Stro-Wold first requested a defense) through August 8, 1985 (the date Shelter finally filed its motion for summary judgment). Finally, the court held that Shelter's failure to file a motion for declaration of no coverage for eight months after it was made a party and after it successfully removed the case to federal court was a "vexatious refusal to defend" Stro-Wold under Mo.Rev.Stat. § 375.420.

Stro-Wold now appeals the district court's grant of summary judgment in favor of Shelter on the issue of coverage, and Shelter appeals the district court's holding that it had a duty to defend despite the absence of coverage up until the date it filed its motion for summary judgment.

## II.

We first consider the question whether the district court correctly granted Shel-

ter's motion for summary judgment on the grounds that the insurance policy purchased by Stro-Wold did not provide coverage for the claims in the Otts' complaint.

Under Missouri law, which governs this diversity case, the construction of language in an insurance policy is governed by the same general rules applied to the construction of other written contracts. *Jordan v. United Equitable Life Insurance Co.*, 486 S.W.2d 664, 667 (Mo.App.1972). The objective in construing the policy is to carry out the intentions of the parties. *Kyte v. Fireman's Fund American Insurance Companies*, 549 S.W.2d 366, 367–68 (Mo.App. 1977). Resort to construction is appropriate only when an ambiguity exists. Where a word or phrase is reasonably susceptible to more than one meaning

the ambiguity will be resolved in favor of the insured. Although parties to an insurance contract may, by plain language, limit the liability of the insurer to the insured, ambiguities in restrictive or exclusionary clauses are to be construed in favor of the insured.

*Kay v. Metropolitan Life Ins. Co.*, 548 S.W.2d 629, 631 (Mo.App.1977).

Stro-Wold makes two main arguments to support its claim that there exist genuine issues of material fact as to whether the Otts' claims are covered by policy. First, Stro-Wold argues that none of the policy exclusions apply because hogs are not "products" as that term is defined in the policy. Second, Stro-Wold argues that summary judgment was inappropriate because the question of when and where the damage to the hogs occurred, and thus whether the products hazard exclusion applies, is a question of fact.

■ As a threshold matter, we reject Stro-Wold's assertion that the policy exclusions are inapplicable because hogs are not "products" under the policy. Stro-Wold points out that the district court dismissed the Otts' strict liability claim on the ground that hogs are not "products" within the meaning of Section 402A of the *Restatement (Second) of Torts* (1977). Stro-Wold thus argues that it is illogical for the district court to determine hogs to be products in one context yet not in another. Further, Stro-Wold argues that because there is no Missouri case law on the question whether hogs are products within the meaning of a products hazard exclusionary clause, the contract is ambiguous and must be construed in its favor.

Stro-Wold's arguments notwithstanding, the district court's finding that hogs are "products" is supported by the language of the policy. As the district court noted, the policy's definition of "product" is considerably broader than the definition of "product" contained in Section 402A of the *Restatement*. Here, the policy definition includes all "goods or products manufactured, sold or handled or distributed by the named insured." Clearly, this definition is broad enough to encompass the hogs that Stro-Wold sold.

■ Alternatively, Stro-Wold argues that even if hogs are products, an issue of material fact exists as to when and where the damage to the hogs occurred and thus whether the products hazard exclusion applies. We find, however, that no matter where the damage occurred, the policy provides no coverage.

To begin with, though the parties are less than clear on this point, the Otts' complaint alleges two types of property damage. First, the complaint states a claim for property damage to the Otts' other property caused by the hogs sold by Stro-Wold. Thus, the Otts allege that their farm was quarantined due to the introduction of the diseased hogs purchased from Stro-Wold. Second, the Otts' complaint alleges property damage to the hogs sold to them by Stro-Wold arising from their infection with swine dysentery. The policy excludes coverage for either type of damage.

Exclusion (p) denies coverage for "property damage included within the completed operations hazard or the products hazard." The definition of "products hazard" is two-pronged. For the exclusion to apply (1) the property damage must "occur away from the premises owned or rented by the insured," and (2) "physical possession" of the products must be "relinquished to others."

Here, it is clear that Exclusion (p) operates to exclude coverage for any property damage the Otts suffered as a result of the introduction of diseased hogs on to their farm. The Otts' farm was quarantined only after the hogs that Stro-Wold sold were "away from the premises" and only after Stro-Wold had relinquished "physical possession." Thus, Exclusion (p) operates to bar coverage for any damage to the Otts' farm, including the infection of the existing herd and subsequent quarantine.

Stro-Wold, however, argues that insofar as the damage to the actual hogs sold by Stro-Wold is concerned, it is not at all clear that this damage did not take place on Stro-Wold's premises. Thus, Stro-Wold contends that it cannot be held as a matter of law that Exclusion (p) operates to exclude coverage for damage to the hogs sold by Stro-Wold. Exclusion (p) would not necessarily preclude coverage for this type of damage because, Stro-Wold argues, for purposes of a products hazard it is the place of the occurrence of the damage, not the site of the negligent act which caused the damage that controls the question of coverage. *Hagen Supply Corp v. Iowa National Mutual Insurance Co.*, 331 F.2d 199, 202–03 (8th Cir.1964). Thus, Stro-Wold takes issue with the district court's statement that:

> The swine dysentery did not manifest itself until the hogs were away from the premises owned by or rented by the insured and after the hogs had been relinquished to the Otts. Although the hogs could have become infected while on the insured's property, it is the place of the occurrence of the damage ... which is controlling.

*Ott v. William Crew et al.*, 85 C 47, slip op. at 19 (E.D.Wis. Feb. 5, 1986).

Stro-Wold is correct in stating that it is not necessarily true, or true as a matter of law, that the place where damage is discovered (i.e., "manifest") is always the same as the place where damage occurred. The place of occurrence and discovery, of course, can sometimes be the same; but whether the infection of the hogs occurred at the place where the swine dysentery was "manifest" is, as Stro-Wold correctly notes, a question of fact.

If Exclusion (p) were the only applicable exclusion, Stro-Wold would be correct in arguing that it can not be determined, as a matter of law, that the products hazard exclusion operates to bar coverage for damage to the hogs Stro-Wold sold. Exclusion (n), however, also applies here. It bars coverage for "property damage to the named insured's products arising out of such products or any part of such products," and, as we noted earlier, hogs are defined as "products" under the policy. Thus, Exclusion (n) denies coverage for property damage to products sold by the insured, which would include any hogs sold by Stro-Wold that were infected at the time of sale.

To sum up, no matter where the damages alleged in the Otts' complaint occurred, the exclusions contained in Stro-Wold's insurance policy operate to deny coverage. Coverage for hogs infected when sold is barred under Exclusion (n), and Exclusion (p) bars coverage for any damage caused to any healthy livestock which were subsequently infected when commingled with the diseased hogs. Thus, the policy provides no coverage for any damages the Otts suffered as a result of having had their farm quarantined due to the introduction of diseased hogs sold by Stro-Wold. As was noted at oral argument, the insurance policy at issue here is a general liability policy; it is not a policy affording products liability or completed operations coverage. Nor does the policy contain, as Stro-Wold alleges, any ambiguities requiring construction in Stro-Wold's favor. Accordingly, we decline Stro-Wold's invitation to rewrite the contract to provide coverage for that which Stro-Wold did not purchase, that is, products coverage.

## III.

Having determined that the exclusionary clauses preclude coverage for the damages alleged in the Otts' complaint, we turn to Shelter's cross appeal challenging the district court's finding that it owed Stro-Wold a duty of defense prior to the date it filed

its motion for summary judgment. Briefly, Shelter argues that that because Judge Curran ultimately concluded that the exclusions contained in the policy precluded coverage, it was never obligated to defend the suit brought by the Otts against Stro-Wold. Thus, Shelter submits: (1) that it made a "good faith and correct determination" that the Otts' claims were excluded by the policy's terms; (2) that it would have been a conflict of interest for Shelter to have provided Stro-Wold with a defense in the Otts' suit; (3) that it refused to defend Stro-Wold at "its own peril," and (4) that because it guessed correctly on the question of coverage it had no obligation, at any time, to defend its insured. Conversely, Shelter argues that only if it had guessed incorrectly as to coverage (i.e., had the district court held that the policy's exclusions did not apply) would it have been required to reimburse Stro-Wold for the costs of its defense. Shelter thus seeks to impose a hindsight test on the insurer's duty to defend whereby an insurer's duty would be based solely on the outcome of the underlying suit.

■ Under Missouri law, however, an insurer's duty to defend is not coextensive with the duty to indemnify. Rather, the insurer's "duty to defend its insured is broader than its duty to pay a judgment rendered against its insured," *United States Fidelity & Guaranty Co. v. Louis Roser Co.*, 585 F.2d 932, 936 (8th Cir.1978); thus a finding of no duty to indemnify need not signify evidence of no duty to defend. In *Missouri Terrazzo Co. v. Iowa National Mutual Insurance Co.*, 740 F.2d 647 (8th Cir.1984), the Eighth Circuit stated that the appropriate standard for determining whether an insurer owes a duty to defend "is based on a comparison of the language of the policy with the allegations of the plaintiff's complaint, and where those allegations state a claim which is *potentially* or *arguably* within the policy's coverage, then the insurer must defend the suit." *Id.* at 652 (emphasis in original); *see also Howard v. Russell Stover Candies, Inc.*, 649 F.2d 620, 624 (8th Cir.1981); *Hartford Accident and Indemnity v. Krekeler*, 491 F.2d 884, 886–87 (8th Cir.1974). Courts,

moreover, have generally placed the burden of uncertainty as to a policy's coverage on the insurer. Any ambiguity as to coverage at the pre-trial stage is to be resolved in favor of the insured. *Lane v. Hartford Fire Ins. Co.*, 343 F.Supp. 79, 82 (E.D.Mo. 1972).

Here, Shelter does not dispute the applicability of the "potentially or arguably" test; rather, Shelter argues that the district court incorrectly relied on the *Terrazzo* decision in finding that it breached its duty to defend because in that case, unlike here, the court found both a duty to defend *and* coverage. However, *Terrazzo* makes clear that the outcome of the action is irrelevant so long as the pleadings in the action state a claim which *potentially* or *arguably* falls within the policy's coverage. By contrast, Shelter's outcome test would provide insurers with incentives not to defend; for under that test an insurer who ultimately lost on the coverage question would be required to pay only what it should have paid anyway.

■ Applying the *Terrazzo* test to the instant case, we agree with the district court that, at the time the Otts first filed their amended complaint, Shelter had a duty to provide Stro-Wold with a defense. Since fidelity to Missouri law compels us to maintain a meaningful difference between a hindsight test and a "potentially or arguably" test, we cannot insist on a stringent conception of the latter. The Otts' claims arguably fell within the terms of the policy because at that time it was not clear whether the district court would ultimately find hogs to be products under the policy and thus it was unclear whether the exclusions would apply. Therefore, based upon the "potentially or arguably" test, Shelter had a duty to defend from the date Stro-Wold first requested a defense until such time as Shelter filed its motion for summary judgment.

## IV.

■ Having concluded that Shelter breached its duty to defend, there remains one additional issue we must address:

whether the district court correctly characterized Shelter's refusal to defend as "vexatious." Our review of the record leads us to disagree with the court's characterization. We do not find that Shelter's refusal was vexatious within the meaning of Mo.Rev.Stat. § 375.420.

Mo.Rev.Stat. § 375.420 provides that an insured is entitled to be reimbursed for defense costs where the insurer's refusal to defend was vexatious. To prove vexatiousness, the insured must show that the refusal was without reasonable or probable cause or excuse. *Housing Authority v. Baumann*, 512 S.W.2d 436, 440 (Mo.App. 1974); *Hay v. Utica Mutual Insurance Co.*, 551 S.W.2d 954 (Mo.App.1977); *Columbia Union National Bank v. Hartford Accident & Indemnity*, 669 F.2d 1210 (8th Cir.1982). In determining whether the insurer's refusal was excusable or reasonable, "the facts must be viewed as they would have appeared to a prudent person before trial. If the refusal appeared willful or unreasonable in this light, the insurer will be held liable to the insured under the statute." *Columbia Union*, 669 F.2d at 1215.

Shelter challenges the district court's finding of vexatiousness on two grounds. First Shelter argues that an insurer who denies coverage to its insured is not required immediately to file a motion for declaration of no coverage. Second, Shelter contends that the fact the district court ultimately agreed that the policy exclusions precluded coverage shows that Shelter's initial refusal to defend was not without "reasonable or probable" cause.

Shelter's second point deserves our attention. The vexatiousness test is an objective one: a court must review the facts as they would have appeared to a prudent person before trial. Here, the district court appears to have imputed a subjective understanding to determine whether Shelter's refusal was reasonable. Thus, the court stated that "if Shelter *believed* from the outset that it had reasonable cause not to defend, it would have brought [a] declaratory judgment motion immediately upon being served with the complaint." *Ott v. William Crew et al.*, No. 85 C 47, slip op. at 21, (E.D.Wis. Feb. 5, 1986) (emphasis added). The test for vexatiousness, however, does not call for measuring Shelter's actions by Shelter's perceptions; it requires courts to reach judgments of reasonableness as an objective attribute of the facts before trial. A court, therefore, cannot hold that an insurer's refusal to defend was unreasonable at the same time that it holds that the insurer's understanding of the contract was correct. In other words, it is simply incorrect to characterize Shelter's initial determination that no coverage existed as "vexatious" (i.e., without reasonable cause) when the district court ultimately reached the same conclusion.

We therefore agree with Shelter that, under the facts of this case, its refusal to defend Stro-Wold was not vexatious. This conclusion, however, does not release Shelter from liability for Stro-Wold's defense costs for, as we noted above, the district court correctly held that Shelter breached its contractual obligation to defend Stro-Wold because the allegations contained in the Otts' complaint stated a claim which was arguably or potentially within the policy's coverage.

### V.

For the reasons stated above, the decision of the district court is

AFFIRMED.